IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

REBECCA FOX, as Guardian ad      )
Litem for R.S., a minor child    )
and individually,                )
                                 )
          Plaintiff,             )
                                 )
     v.                          )
                                 )   1:22-cv-952
CHAPEL HILL-CARRBORO CITY         )
SCHOOLS BOARD OF EDUCATION;      )
MISTI WILLIAMS, in her            )
individual and official          )
capacity; EMILY BIVINS, in her   )
individual and official          )
capacity; SUZETH GONZALEZ, in    )
her individual and official      )
capacity; and QUAMESHA WHITTED-  )
MILLER, in her individual and    )
official capacity,               )
                                 )
          Defendants.            )


**MEMORANDUM OPINION AND ORDER**

**OSTEEN, JR., District Judge**

     Before this court is Defendants' Motion to Dismiss and

Answer to Plaintiff's Third Amended Complaint, (Doc. 76),[1]

Defendants' Motion for Summary Judgment, (Doc. 82), Plaintiffs'

Motion in Limine, (Doc. 114), Defendants' Motion in Limine to

Bifurcate, (Doc. 117), Defendants' Motion in Limine to Exclude

---

     [1] This motion will be denied, as it is unaccompanied by a
brief and therefore does not comply with Local Civil Rule
7.3(a). L.R. 7.3(a).

Certain Evidence, (Doc. 120), and Plaintiffs' Motion to Redact Information and Substitute Filed Documents, (Doc. 138).

For the reasons stated herein, Defendants' Motion to Dismiss and Answer to Plaintiff's Third Amended Complaint will be denied, Defendants' Motion for Summary Judgment will be granted, all three motions in limine will be denied as moot, and Plaintiffs' Motion to Redact Information and Substitute Filed Documents will be granted.

I.    **FACTUAL BACKGROUND**

In the fall of 2019, Plaintiff R.S. was a five-year-old kindergarten student at Frank Porter Graham Bilingue Elementary School ("FPG"), which is part of the Chapel Hill-Carrboro City School system. Her mother, Plaintiff Fox, worked at the school as a speech language pathologist. (Defs.' Ex. 4, Dep. of Rebecca Fox ("Fox Dep.") (Doc. 85-4) at 27.)[2] Plaintiffs' claims derive from R.S.'s report that her kindergarten classmate inappropriately touched her.

On the evening of Friday, November 1, 2019, Fox noticed that R.S.'s vulva was "red and raw." (Pls.' Ex. 9, Fox Declaration ("Fox Decl.") (Doc. 94-9) at 2.) Fox asked R.S. if

_____

[2] All citations in this Memorandum Opinion and Order to documents filed with the court refer to the page numbers located at the bottom right-hand corner of the documents as they appear on CM/ECF.

- 2 -

anyone had touched her on her private parts and R.S. responded that the day prior, October 31, her kindergarten classmate, Minor Classmate ("M.C."), had "put his hand on [her] panties and moved his hand back and forth and back and forth." (Id. at 2-3.)[3] Additionally, R.S. relayed that M.C. "wanted to do it again" the next day, November 1, at recess, but her friends helped her hide from him. (See Pls.' Ex. 30, E-mail chain (Doc. 94-30) at 1.) R.S.'s father was also present for the disclosure. (Pls.' Ex. 8, (Doc. 94-8) at 2.)

At 7:44 p.m., after receiving R.S.'s report, Fox sent an e-mail to 1) R.S.'s kindergarten teacher, Selene Paque, 2) her teacher's assistant ("TA"), Madeline Maldonado, 3) the school's guidance counselor, Barbie Garayua-Tudryn, 4) the school's assistant principal, Karen Galassi-Ferrer, and 5) the school's

---

[3] The evidence is conflicting as to where this incident occurred. R.S.'s mother and R.S.'s therapist relay that R.S. told them it occurred on the playground at recess. (See Pls.' Ex. 9, Fox Decl. (Doc. 94-9) at 3 ("R.S. told my husband and me that Minor Classmate had done this to her at recess . . . .")); Pls.' Ex. 5, Aff. of Treating Clinician Nancy L. Berson, LCSW ("Berson Aff.") (Doc. 94-5) at 3 ("Per R.S., this 'particular' incident occurred on the school playground.").) R.S.'s mother, in her email to school officials regarding R.S.'s report, stated: "I think this was at recess." (Pls.' Ex. 30, E-mail chain (Doc. 94-30) at 1.) But in an audio recording of the school principal's interview of R.S., R.S. states that the incident occurred in the classroom. (See R.S. Initial Meeting – Full (Doc. 105) at 07:44-07:50.)

principal, Emily Bivins. (Pls.' Ex. 30, E-mail chain (Doc. 94-30) at 1.) Fox explained,

> Tonight [R.S.] told me that her classmate [M.C.] touched her on the vulva. "He came up to me and put his hand on my panties and moved his hand back and forth and back and forth." She said this happened yesterday and that today "he wanted to do it again but [A.R.] helped me find a hiding place." I think this was at recess. On other occasions she has said he has tickled her under her arms and wouldn't stop and that she's told the teacher. She said she did not want to tell the teacher about this because "it's private," and she also seemed embarrassed and said that she had not wanted to tell me.

(Id.)

Paque responded at 8:11 p.m., acknowledging that "it is challenging to keep an eye on all students interactions" and suggesting a "safe touch conversation" for the children and an "e-mail to all parents to help me have a conversation with their children about safe touches." (Id.) At 8:41 p.m., Fox responded, agreeing that a class-wide conversation "was a good idea," but expressing her concern about R.S.'s safety as she "appears to have been physically harmed by this." (Id. at 2.) Fox also expressed that she "would like to know what the school's

protocols are for safety during recess, as [R.S.] indicates this may have happened on more than one occasion." (Id.)[4]

On Sunday, November 3, Fox took R.S. to the doctor. (Pls.' Ex. 9, Fox Decl. (Doc. 94-9) at 4.) R.S. told the doctor that M.C. had touched her "one, two, three, four, five times." (Id.) According to Fox, R.S. showed the doctor how M.C. touched her, and it was "more sexual" than Fox expected. (Id.; see also Defs.' Ex. 4, Fox Dep. (Doc. 85-4) at 98–99.)[5]

Fox did not receive any communications from school officials on Saturday, November 2, or Sunday, November 3. (See Pls.' Ex. 9, Fox Decl. (Doc. 94-9) at 4.)

A.    **Monday, November 4, 2019**

On Monday, November 4, at 6:36 a.m., Fox replied-all to the email she had sent on Friday evening, stating "I hope we can all meet about this soon and that the silence in response to this is

---

[4] Although Fox noted in this e-mail that "this may have happened on more than one occasion," she stated in her deposition that "as far as I knew then and as far as I know now he only touched her on that one occasion, October 31st, 2019." (Defs.' Ex. 4, Deposition of Rebecca Fox ("Fox Dep.") (Doc. 85-4) at 136–37.)

[5] Fox stated in her deposition and in her declaration that the doctor verbally conveyed to her that there was bruising on R.S.'s vulva. (Pls.' Ex. 9, Fox Decl. (Doc. 94-9) at 4; Defs.' Ex. 4, Fox Dep. (Doc. 85-4) at 241.) However, in her deposition, Fox acknowledged that the doctor's notes from the appointment convey that the exam was "normal," with "[n]o bruising, swelling or redness," (Defs.' Ex. 4, Fox. Dep. (Doc. 85-4) at 373), and Fox stated that she "[did not] remember seeing bruising," (id. at 375).

- 5 -

because you haven't seen these emails. Presuming that's the case, here's a Monday morning 'bump.' [R.S.] will be absent today and until there's a plan in place for her safety." (Pls.' Ex. 30, E-mail chain (Doc. 94-30) at 2.) At 7:37 a.m., FPG Principal, Emily Bivins, responded, stating

> I am very sorry this has happened to [R.S.]. In situations like this, we investigate by interviewing both students, the teachers and any other students involved. Once we have all the information, we can move forward with a plan for instruction and safety. I would like to have [R.S.] here to be able to begin that process.

(Id.) Bivins and Fox agreed that Bivins would interview R.S. at 9:00 a.m. and Bivins advised the interview would "take about 10 minutes at most." (Id. at 3.) At 8:04 a.m., FPG counselor, Barbie Garayua-Tudryn, responded to Fox's initial e-mail, stating that she would be "available to assist in any way I can to ensure everyone's emotional and physical safety." (Id.)

- 6 -

That Monday, November 4, 2019, it is undisputed that Bivins took the following actions.[6] Bivins communicated with R.S.'s teacher, Paque, who conveyed that she had received reports about tapping and tickling on the carpet, and that on November 1, 2019, she had "called [M.C.'s] parents letting them know that he was going to fill out a behavior journal,[7] but it was not about [R.S.] at all." (Pls.' Ex. 30, E-mail chain (Doc. 94-30) at 4.) Bivins also spoke with Paque's TA, Maldonado, who reported having seen M.C. and another child, C.K., tickling, but had "not seen inappropriate touching in private parts." (Pls.' Ex. 16, Investigation Notes (Doc. 94-16) at 2.)

_____

[6] The exact order in which Bivins took these actions is not entirely clear. Bivins stated in her deposition that she spoke with "the teacher and the assistant" first, "then [Fox] and her husband came in with [R.S.], and [R.S.] was the first student I interviewed." (Defs.' Ex. 1, Deposition of Emily Bivins ("Bivins Dep.") (Doc. 85-1) at 98.) Plaintiffs dispute the order as outlined by Bivins, citing her investigation notes, which are ordered differently, with M.C.'s interview notes at the top of the page under a notation of "8:40 a.m." (See Pls.' Resp. (Doc. 94) at 3; Pls.' Ex. 16, Investigation Notes (Doc. 94-16) at 1.) This dispute regarding the order of interviews is not material to Plaintiffs' claims.

[7] According to Bivins, "[a] behavior journal is an opportunity for a student to identify the school rule that was broken, and then reflect on that behavior and how it might make someone else feel or what it might have done to someone else, and then what they might do differently the next time. And then the teacher confers with the student after they independently complete the behavior journal." (Defs.' Ex. 1, Bivins Dep. (Doc. 85-1) at 88.)

- 7 -

At 9:00 a.m., Bivins interviewed R.S., who was accompanied by her parents. (Defs.' Ex. 1, Bivins Dep. (Doc. 85-1) at 98; Pls.' Ex. 16, Investigation Notes (Doc. 94-16) at 1.) Fox recorded this interview without Defendant Bivins' knowledge. (Defs.' Ex. 4, Fox Dep. (Doc. 85-4) at 229-30.) During the interview, R.S. relayed that M.C. "touch[ed] her bottom" "five times" in the classroom during the class's "Day of the Dead" celebration, that she "told the teachers," and that he also "did it on another day." (See R.S. Initial Meeting – Full (Doc. 105).) R.S. also disclosed that her friends helped her hide from M.C. during recess. (R.S. Initial Meeting – Full (Doc. 105) at 13:16-13:26.) During the interview, Bivins asked R.S. if M.C. has "ever touched you or tickled [her] before," if R.S. "like[s] tickles," and if she "sometimes . . . laugh[s] when [she] gets tickles." (Id. at 08:29-09:28.) Bivins also told R.S. that

> nobody should ever touch anybody in their private parts. Or tickle and touch in a way that makes you uncomfortable. That's against the rules and it's not okay. And there are consequences when that happens. . . . That means that kids get into trouble when they're touching or tickling and people say stop and they don't stop. Because when somebody says stop, it always means stop. It's never okay for somebody to keep doing something when somebody says stop, I don't like that.

(Id. at 09:49-10:19.) Bivins praised R.S. for telling adults what happened, saying,

> you are super brave to tell me all these things that have happened to you. This is pretty amazing that you

- 8 -

are this brave and can tell all these things. I am very proud of you, just like your mommy and daddy are. [R.S.], it's never okay for someone to touch you in a way that doesn't make you feel comfortable whether that's tickling, or even holding your hand, or sitting too close to you and anytime you use your words or use your body to say get away, I don't like that, then people have to respect that. And you want them to stay away when they're doing things that make you uncomfortable.

(Id. at 12:11-12:44.)

Bivins also asked R.S., "what can we do to make you feel better about being in class with [M.C.] and being on the playground with [M.C.]," to which R.S. responded, "how about we tell him that you can't touch private parts anymore?" (Id. at 14:12-14:31.) R.S. also said that the grown-ups sit and talk to each other at recess and "[i]t would be better if there was [grown-ups] all around the park to watch everywhere on the park." (Id. at 15:19-16:02.) In response, Bivins explained that "their job is to make sure they're watching the kids. So we have to make sure they're watching the kids too. And sounds like they need to be in different parts of the playground to be able to watch better." (Id. at 16:05-16:15.) Bivins then asked R.S. how her TA would be able to recognize when R.S. was playing a "chase fun game" versus an "uncomfortable game," to which R.S. responded that she would "go and tell her if it was a fun game or not a fun game." (Id. at 16:18-16:51.) Bivins also reminded R.S. of the names of several grown-ups who could help her if she

ever felt uncomfortable, including Paque, Maldonado, "Ms. Tatiana," "Ms. Raquel," "Senor Luis," and Ms. Barbie [Garayua-Tudryn], Nurse Anderson, and her mom. (Id. at 17:10-18:19.)

Bivins also interviewed M.C., who admitted to touching his friends, including R.S. (See Defs.' Ex. 1, Bivins Dep. (Doc. 85-1) at 100-01; Pls.' Ex. 16, Investigation Notes (Doc. 94-16) at 1.)[8] M.C. also conveyed that sometimes he touches and tickles his friend, K.G., at the park at recess. (Pls.' Ex. 16, Investigation Notes (Doc. 94-16) at 1.) Bivins told M.C. that "the behavior was unacceptable and would not be tolerated at school, and that he would have to stop or he would have consequences." (Defs.' Ex. 1, Bivins Dep. (Doc. 85-1) at 101.)

Bivins also interviewed other children in the class. (Id. at 102; Pls.' Ex. 16, Investigation Notes (Doc. 94-16) at 1.) According to Bivins, R.S.'s friends relayed that "there was a lot of tickling going on, but they did not indicate anything

---

[8] It is not clear what exactly M.C. admitted to in this interview. In her deposition, Bivins recalls that M.C. acknowledged "that he had touched students on the bottom," but did not specifically acknowledge that he had touched people on their "private parts." (Defs.' Ex. 1, Bivins Dep. (Doc. 85-1) at 101.) But Bivins' investigation notes relay that M.C. "sh[ook] his head yes" when Bivins said "[a] friend said you touched her in the privates," and that M.C. described that while playing on the carpet, "[t]hey were touching and tickling — head, bellies, and privates. R.S. said stop and told the teacher. M.C. got a behavior journal." (Pls.' Ex. 16, Investigation Notes (Doc. 94-16) at 1.) Regardless, it is undisputed that M.C. admitted to, in some variation, touching R.S. inappropriately.

- 10 -

about touching other students on the bottom or in private parts." (Defs.' Ex. 1, Bivins Dep. (Doc. 85-1) at 102; <u>see also</u> Pls.' Ex. 16, Investigation Notes (Doc. 94-16) at 1.) Bivins also interviewed K.G., who conveyed that M.C. had touched him before,[9] and interviewed M.C.'s older brother, A.V., who shared that "he already knew that M.C. was touching kids" and that M.C.'s teacher, Ms. Paque, had sent their mother a notification. (Pls.' Ex. 16, Investigation Notes (Doc. 94-16) at 1.)

At 9:45 a.m., Bivins emailed Fox to update her on the investigation. She reiterated that R.S. is "very brave," and conveyed that "[t]here are more kids involved than just R.S. as both ticklers/touchers and recipients." (Pls.' Ex. 30, E-mail chain (Doc. 94-30) at 4.) She then outlined next steps, explaining that

> [o]nce we finish our student talks, we will reach out to other parents to let them know what is happening. Barbie [Garayua-Tudryn] will go in and do a formal class lesson on safety, tickling and touching. This will include reporting. I will meet with Madeline [Maldonado] and Selene [Paque] and the other K assistants about student supervision and student reporting for situations like this. I will alert Ms. Raquel that R.S. views her as a safety person as well. Ms. Paque will also arrange

---

[9] Bivins' investigation notes state that K.G. said "M.C. touched him sometimes" but would not name where "because it was embarrassing." (Pls.' Ex. 16, Investigation Notes (Doc. 94-16) at 1.) However, the narrative of the police report Bivins subsequently filed, which was created by speaking with Bivins, conveys that "K.G. said that M.C. had touched his 'private parts' before." (Pls.' Ex. 18, R.S. Police Report (Doc. 94-18) at 3.)

- 11 -

seating in the classroom so [M.C.] is not seated near
R.S. on the carpet or table groups.

(Id.) Fox responded at 10:13 a.m., and explained that at R.S.'s
doctor's appointment, "she gestured to show how [M.C.] touched
her, and it was not what I expected given her initial
description. It was sexual, and she still has bruising on ver
[sic] vagina." (Id. 5.)[10] In her response, Fox also expressed
concern with recess supervision, noting that she was "surprised
to find out that on some days there are only four adults
supervising 90-ish children at recess." (Id.) Fox ended her
email by relaying she did not want "to risk sending [R.S.] back
until I know what the new plan is." (Id.)

That same day, Bivins called M.C.'s parents by phone and
met with them in person. (Defs.' Ex. 1, Bivins Dep. (Doc. 85-1)
at 96-97.) They were concerned and "indicated that they would
take action at their house." (Id. at 97.) Bivins also relayed
Fox's report to the school nurse, Nurse Anderson, who told her
that "it is likely not physically possible for [R.S.] to have
that that type of redness and irritation based on the reports of
[R.S.] and the other students."[11] (Id. at 104-05.) Bivins also
met with her Assistant Principal, Galassi-Ferrer, and the school

---

[10] See supra n.5.
[11] Nurse Anderson never evaluated R.S. (Defs.' Ex. 1, Bivins
Dep. (Doc. 85-1) at 104.)

- 12 -

Counselor, Barbie Garayua-Tudryn, to devise a plan to address the report. (Id. at 103.)

At 7:54 p.m. that evening, Bivins emailed Fox and explained that

> M.C. did not acknowledge that he touched or rubbed R.S.'s privates but he does acknowledge that he has been tickling and has touched in the privates (in general, not R.S. specifically). We have no reason to not believe him or R.S. but we can not confirm or not not confirm the level of touching that would result in her privates being red and irritated.[12]

(Pls.' Ex. 30, E-mail chain (Doc. 94-30) at 5.) Bivins then explained that she had 1) contacted other parents, 2) met with Maldonado and Paque about student supervision and student reporting for situations like this, 3) instructed Paque to arrange seating in the classroom so that M.C. would not be seated near R.S. on the carpet or table groups, and 4) offered R.S. option to move to a new classroom. (See id.) She also outlined her planned next steps: 1) that school counselor, Garayua-Tudryn, would do a formal class lesson on safety, tickling, and touching on Thursday, November 7; 2) that Bivins

---

[12] Contrary to what is conveyed in this email, it is undisputed that that M.C. did admit to inappropriately touching R.S. in some way during his interview with Principal Bivins. (See Defs.' Ex. 1, Bivins Dep. (Doc. 85-1) at 100-01 ("[M.C.] conveyed that he had been touching other students, [R.S.] included, and he acknowledged that he had touched students on the bottom."); see Pls.' Ex. 16, Investigation Notes (Doc. 94-16) at 1 (conveying that M.C. shook his head yes when asked if he touched a friend on the privates).)

- 13 -

would meet with other TAs to discuss student supervision on November 6, and 3) that she would contact Chapel Hill Community Policing to file a report on November 5. (See id.)

**B. Tuesday, November 5, 2019**

On Tuesday, November 5, Bivins filed a police report with the Chapel Hill Police Department. (Defs.' Ex. 1, Bivins Dep. (Doc. 85-1) at 108; see Pls.' Ex. 18, R.S. Police Report (Doc. 94-18).) In the report, the incident is categorized as "sexual battery," with R.S. listed as a victim and K.G. and A.V. listed as "others involved." (See Pls.' Ex. 18, R.S. Police Report (Doc. 94-18) at 1.)

**C. Wednesday, November 6, 2019**

On Wednesday, November 6 at 6:53 a.m., Fox emailed Bivins asking whether the "TAs and other parents . . . know the severity of the situation" and requesting "in writing the plan for better supervision while this situation is under investigation and whatever plan is put in place afterward, including how the school will ensure the plans are really followed so this never happens again to R.S. or anyone else." (Pls.' Ex. 30, E-mail chain (Doc. 94-30) at 6.) She also requested that "if it's possible for [R.S.] to be with her many Pre-K and family friends in Caro's class, then we will take you up on the offer to change classes." (Id.)

- 14 -

Bivins responded later that same day, at 11:48 a.m., explaining that the TAs "are clear about the severity of the situation. They are aware of the areas of supervision and how to space themselves for adequate supervision." (Defs.' Ex. 2, R.S. e-mail chain (Doc. 85-2) at 6.) She further explained that the "investigation is complete and the plan of action shared in an earlier email has been enacted. The administration will confer weekly with the classroom teachers and assistants for the next two months." (Id.) Finally, Bivins agreed to Fox's request that R.S. be placed in "Caro's" class, and said that she would "make that change so she can begin when she returns to school." (Id.)

### D. **Thursday, November 7, 2019**

On November 7, at 8:32 a.m., R.S.'s father emailed Bivins, requesting further details on the recess supervision plan, specifically 1) what the areas of supervision are, 2) how monitors will be spaced, 3) what the policy is for phone use, 4) if there is a minimum number of monitors, and 5) whether teachers will or will not be joining TAs to supervise recess. (Id. at 7.) Bivins responded at 9:45 a.m., defining the areas of supervision as "blacktop, field, play structure, [and] swing area," and explaining that teachers do not attend recess unless a TA is absent. (Id.)

E.  **Friday, November 8, 2019**

On November 8, Garayua-Tudryn responded to a November 7 email from Fox requesting therapists in the area, providing a list of recommended providers. (Pls.' Ex. 31, "child trauma therapists?" e-mail chain (Doc. 94-31) at 1.)

F.  **Tuesday, November 12, 2019**

On Tuesday, November 12, Fox emailed Bivins and Galassi-Ferrer at 6:38 a.m. that R.S. would be absent again as "[w]e aren't confident in the safety plan, which seems to be that the same TAs who let this happen will continue to supervise the children, except now they have to be in zones." (Pls.' Ex. 30, E-mail chain (Doc. 94-30) at 7.)[13] At 8:45 a.m., Bivins forwarded Fox's emails to Quamesha Whitted-Miller and Misti Williams,[14] explaining that "[t]he child has not been in school since last Monday and [Guardian] has not been fully present. I think she is preparing for a lawsuit." (Id. at 8.) Bivins then e-mailed Fox,

---

[13] As discussed supra n.3, it is not clear whether the reported incident occurred on the playground, under the supervision of the TAs to which Fox refers, or in the classroom, under the supervision of Paque and Maldonado.

[14] Defendant Williams was Bivins' supervisor at the time. (See Pls.' Ex. 34, Dep. of Emily Bivins ("Bivins Dep.") (Doc. 94-34) at 19.) According to Fox's deposition, Whitted-Miller was a human resources employee of the school board. (Defs.' Ex. 4, Fox Dep. (Doc. 85-4) at 107.)

- 16 -

alerting her that she had referred her string of emails to the central office of the school district. (Id.)

## G.  **Thursday, November 14, 2019**

Around November 14, Fox had a meeting to discuss the incident with the school district's lawyer and Defendant Quamesha Whitted-Miller. (Defs.' Ex. 4, Fox Dep. (85-4) at 107.)

## H.  **Wednesday, November 20, 2019**

On Wednesday, November 20, after Fox requested an update on the safety plan by email, Bivins responded as follows

It was my understanding that the school district's attorney and Human Resources were taking the next actions and communication.

We want nothing more than for [R.S.] to return to school. Our plan is for her or the other student to transition to another class (the only Option is Laguna), teachers accompany TAs and class to recess, Safe Touch presentation given to Paque's class and other K-1 classes two weeks ago[15] and additional training and monitoring for teachers and assistants about student supervision. The other family had also followed up with the police, DSS and a therapist for their child. We can aldo [sic] refer [R.S.] to school based mental health but I understood from the community policing that you

_____

[15] At the November 5, 2024, hearing before this court, Plaintiff argued that there is a dispute of fact as to whether this lesson ever occurred. Specifically, she stated "[t]here was evidence to suggest that they did not [have a safe touch class]," and verbally cited "evidence from the Orange County Rape Crisis Center" in support. That evidence has not been presented to this court. There is evidence before this court that the safe touch class did occur, (see Pls.' Ex. 30, E-mail chain (Doc. 94-30) at 8), but there is no evidence on the record suggesting the safe touch class did not occur. This fact is thus not in dispute.

- 17 -

were looking into something outside of school. I am not
sure what else is expected which is why we are waiting
on HR.

(Pls.' Ex. 30, E-mail chain (Doc. 94-30) at 8.) Fox responded

that evening, expressing her thanks and requesting that R.S.

stay in Paque's class. (Id. at 9.) Bivins responded soon after,

noting that she would "reach out to [M.C.'s] family about a

class change." (Id.)

### I. **Thursday, November 21, 2019**

On Thursday, November 21 at 10:33 a.m., Fox emailed Paque,

Garayua-Tudryn, Bivins, and Galassi-Ferrer, reporting that

"[g]iven the new safety plan, [R.S.] will come back [to school]

on Monday!" (Pls.' Ex. 32, "[R.S.] returning" e-mail chain (Doc.

94-32) at 1.) Fox also requested "a brief meeting for [R.S.]"

with Paque and Garayua-Tudryn, requesting 1) they "let[] [R.S.]

know" that "[g]rown-ups are proud of her; grownups have new

ideas and new rules to help all the kids be safe; grownups will

make sure she and [M.C.] won't be together," 2) Paque to "tell

[R.S.] she's sorry she didn't hear her when [R.S.] tried to tell

([R.S.] did tell that [M.C.] had tickled her . . . .)," and 3)

they "make a very quick hand-print project," with her. (Id.) All

parties agreed to the plan, and Bivins requested Fox sign a

release form so that Garayua-Tudryn could speak to R.S.'s

therapist. (Id. at 1-2.)

- 18 -

Later that day, R.S. told her nanny additional information about the initial incident, specifically that M.C. put his fingers in her vagina and in her anus. (Pls.' Ex. 3, Cynthia Balderas Decl. ("Balderas Decl.") (Doc. 94-3) at 2.) Fox immediately conveyed this new disclosure to Bivins, Paque, Garayua-Tudryn, and Galassi-Ferrer at 5:07 p.m. (Pls.' Ex. 32, "[R.S.] returning" e-mail chain (Doc. 94-32) at 3.) Bivins responded at 5:15 p.m., advising Fox to "contact the Community policing office and share this disclosure with them." (Id.) Fox responded, "Thanks. We sure will." (Id.) After this disclosure, Bivins also e-mailed Williams, "formally request[ing] that [Fox's] children be placed at Carrboro Elementary." (Id.)

**J.    Friday, November 22, 2019**

On November 22, R.S. returned to school and had the reorientation meeting requested by Fox, although Fox stated in her deposition that "Paque did not, in fact, . . . say or apologize for . . . not hearing [R.S.]." (Defs.' Ex. 4, Fox Dep. (Doc. 85-4) at 284–86.) Additionally, Fox met with Defendant Williams "in her role as parent ombudsman," who "suggested that

- 19 -

[she] move R.S. to a different school." (Pls.' Ex. 9, Fox Decl. (Doc. 94-9) at 9.)[16]

**K.   Monday, December 2, 2019**

On December 2 at 8:39 p.m., R.S.'s father emailed Bivins and Williams that R.S. was "scared about seeing M.C." and R.S. thought that "adults were still not watching the kids at recess." (Pls.' Ex. 32, "[R.S.]" returning e-mail chain (Doc. 94-32) at 4.) Her father noted, "We're not sure how much of this is her fear or whether the adults are still not paying proper attention or both." (Id.) Bivins responded at 9:28 p.m., explaining that "[t]here are several staff checking up on supervision on the playground," but also stating that she would "speak with the K teachers and assistants again about your concerns." (Id.)[17]

**L.   Wednesday, December 4, 2019**

On December 4, R.S. reported to her therapist, Nancy Berson, that M.C. had threatened her at recess, saying that if she did not get off the swing, he would touch her private parts

---

[16] Fox stated in her deposition that the prospect of switching schools was "offered as an option," but that the ultimate decision was left up to her. (Defs.' Ex. 4, Fox Dep. (Doc. 85-4) at 325-26.)

[17] At 9:29 p.m., Bivins emailed Galassi-Ferrer, "This just won't end. Go to Carrboro already." (Pls.' Ex. 32, "[R.S.] returning" e-mail chain (Doc. 94-32) at 4.)

again. (Pls.' Ex. 5, Berson Aff. (Doc. 94-5) at 4.) Fox emailed

Williams, sharing this disclosure but noting that it was

"unclear whether it actually happened or whether it's a

manifestation of her fears." (Defs.' Ex. 5, "Re: recess

supervision" e-mail chain (Doc. 85-5) at 5.) Fox also shared

that "[w]e were told by our social worker that the school

guidance counselor, Ms. Barbie [Garayua-Tudryn] told her "[]

could not possibly have threatened [R.S.] because 'he has had so

many talks,' and because 'she knows that child.'" (Id.)[18]

Williams responded that evening at 6:40 p.m., copying Bivins and

Galassi-Ferrer and instructing them to "conduct an investigation

first thing tomorrow morning." (Id.) Bivins responded at 10:30

p.m., confirming they would investigate in the morning. (Id.)

**M.  Thursday, December 5, 2019**

The following morning, Bivins emailed Fox at 9:42 a.m.,

stating:

> I have met with school staff. They showed me the PLC
> agenda where the assigned playground locations are and
> the staff is spread out to provide the adequate
> supervision we expect. [R.S.] wears a bright pink jacket
> which has made it easier to track her movement on the
> playground. There is designated staff who watch [R.S.]

_____

[18] In her Declaration, R.S.'s therapist, Nancy Berson,
asserts that Garayua-Tudryn stated "[M.C.] was a young boy, and
she did not see the need for [M.C.] and R.S. to have separate
times at recess." (Pls' Ex. 5, Berson Aff. (Doc. 94-5) at 5.)
According to Berson, "Tudryn also expressed skepticism regarding
R.S.'s initial report on November 1, 2019, and R.S.'s most
recent concerns." (Id.)

- 21 -

and another staff who is watching []. The staff has shared that [R.S.] and [] have not interacted with one another. [R.S.] is generally playing tag with other kids. She was observed running and hiding with some friends during the tag game but [] was not involved. [R.S.] is not in school today.

Barbie [Garayua-Tudryn] talked with Nancy Berson yesterday and an email was received by Selene [Paque] about the session with Nancy. Nancy is recommending that [] not be in any space in which [] is (morning meeting, recess, lunch, transitions, etc). As I have already shared, that is just not possible. The adults are vigilant in their supervision and are sneering there is no interaction.

(Id. at 6.) Fox responded at 4:25 p.m., formally withdrawing

R.S. from FPG. (Id.)[19]

## II.  **PROCEDURAL HISTORY**

Plaintiffs filed their complaint on November 8, 2022. (Doc. 1.) On the same day, Fox moved for appointment of guardian ad litem for minor, R.S., (Doc. 3), which was granted on February 6, 2023, (Doc. 18). On January 17, 2023, Plaintiffs filed their First Amended Complaint, (Doc. 15). On January 9, 2024, Plaintiffs filed their Second Amended Complaint, (Doc. 59).

On February 23, 2024, Plaintiffs filed their Third Amended Complaint ("TAC"), (Third Am. Compl. ("TAC") (Doc. 73)). On

---

[19] Defendants, in their reply brief, "move to strike the reference and exhibit in Plaintiff's Response Brief" to the argument that Plaintiff Rebecca Fox, "as a Jewish woman, felt discriminated against by Bivins." (Defs.' Reply (Doc. 99) at 2.) Neither Plaintiffs' argument nor corresponding exhibit are relevant to their current claims, and as such this court does not rely upon them.

March 8, 2024, all Defendants filed a Motion to Dismiss and
Answer to Plaintiff's Third Amended Complaint, (Doc. 76). On
April, 15, 2024, Defendants filed a Motion for Summary Judgment,
(Doc. 82), accompanied by a supporting memorandum, (Defs.' Mem.
in Support ("Defs.' Mem.") (Doc. 85)).[20] Plaintiffs responded in
opposition on May 3, 2024, (Pls.' Resp. in Opp'n ("Pls.' Resp.")
(Doc. 94)). Defendants replied on May 17, 2024, (Defs.' Reply to
Pl.'s Mem. ("Defs.' Reply") (Doc. 99)).

On May 5, 2024, Plaintiffs filed a Motion to Strike
Defendants' Expert Opinion, (Doc. 95), which was denied by this
court on November 5, 2024, (Docket Entry 11/05/2024). On October
4, 2024, Defendants filed a Motion in Limine to Exclude or Limit
Evidence of Certain Experts or Other Evidence Requiring
Expertise, (Doc. 119), which was denied by this court on
November 5, 2024, (Docket Entry 11/05/2024). On October 22,
2024, Plaintiffs filed a Motion in Limine seeking to preclude
any expert evidence from Dr. Elizabeth Rodano at trial, (Doc.
132), which this court denied on November 5, 2024, (Docket Entry
11/05/2024).

---

[20] This court refers throughout this Memorandum Opinion and
Order to Defendants' sealed memorandum in support of their
motion for summary judgment. The public, unsealed memorandum is
found at Docket Entry 83. (See Doc. 83.)

On March 10, 2025, Plaintiffs filed a Motion to Redact Information and Substitute Filed Documents, (Doc. 138).

### III. **STANDARD OF REVIEW**

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). This court's summary judgment inquiry is whether the evidence "is so one-sided that one party must prevail as a matter of law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986). The moving party bears the initial burden of demonstrating "that there is an absence of evidence to support the nonmoving party's case." Celotex Corp., 477 U.S. at 325. If the "moving party discharges its burden . . . , the nonmoving party must come forward with specific facts showing that there is a genuine issue for trial." McLean v. Patten Cmtys., Inc., 332 F.3d 714, 719 (4th Cir. 2003) (citing Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986)). Summary judgment should be granted "unless a reasonable jury could return a verdict in favor of the nonmovant on the evidence presented." McLean, 332 F.3d at 719 (citing Liberty Lobby, 477 U.S. at 247-48).

IV. **ANALYSIS**

Plaintiff R.S., by and through her guardian ad litem, Rebecca Fox, brings the following claims: 1) a Title IX claim against Defendant School Board, 2) 42 U.S.C. § 1983 claims against Defendant School Board and all individual Defendants, in their individual capacities, 3) state law claims of negligent infliction of emotional distress against Defendant Board and Defendant Bivins in her individual capacity, and 4) a state law claim of negligent supervision and retention against Defendant Board. (See TAC (Doc. 73) ¶¶ 111-192.) Plaintiff Fox brings one state law claim of parental loss of services and companionship against Defendant Board. (Id. ¶¶ 193-95.)

A. **Title IX Claim against Defendant School Board**[21]

Plaintiff R.S. alleges that Defendant School Board violated Title IX by "fail[ing] to use their authority to end the harassment reported by R.S." (TAC (Doc. 73) ¶ 111-130; see also Pls.' Resp. (Doc. 94) at 7 ("Defendants failed to take prompt and effective steps reasonably calculated to end the sexual

---

[21] Although Plaintiff refers to Title IX as "U.S.C. § 1972," (see TAC (Doc. 73) at 16; Pls.' Resp. (Doc. 94) at 7), this court understands Plaintiff's Title IX claim to invoke 20 U.S.C. §§ 1681-1686, the statutes codifying Title IX.

harassment, eliminate the hostile environment, prevent the harassment from recurring, and remedy its effects.").)[22]

Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). Although Title IX does not provide an express private remedy, the Supreme Court in Cannon v. University of Chicago found that "the words and history of Title IX, but also its subject matter and underlying purposes, counsel implication of a cause of action in favor of private victims of discrimination." 441 U.S. 677, 709 (1979). This implied private remedy under Title IX is available to victims of "student-on-student" or "peer" sexual harassment. See generally Davis v. Monroe Cnty Bd. Of Educ., 526 U.S. 629 (1999).

---

[22] Plaintiffs' Third Amended Complaint also alleges that Defendant School Board violated Title IX by "fail[ing] to provide a safe environment for R.S. which resulted in her being sexually harassed and bullied by her classmate." (TAC (Doc. 73) ¶ 113.) However, Plaintiffs do not argue this "pre-assault" Title IX liability theory at summary judgment, so this court does not address it. See Kinetic Concepts, Inc. v. Convatec Inc., No. 1:08CV00918, 2010 WL 1667285, at *8 (M.D.N.C. Apr. 23, 2010) (explaining that "in a variety of different contexts, a large number of courts . . . have recognized the general principle that a party who fails to address an issue has conceded the issue") (collecting cases).

To hold an educational institution liable for student-on-student sexual harassment, a plaintiff must show:

1) they were a student at an educational institution receiving federal funds;

2) they suffered sexual harassment that was so severe, pervasive, and objectively offensive that it deprived them of equal access to the educational opportunities or benefits provided by their school;

3) the school, through an official who has authority to address the alleged harassment and to institute corrective measures, had actual notice or knowledge of the alleged harassment; and

4) the school acted with deliberate indifference to the alleged harassment.

Doe v. Fairfax Cnty. Sch. Bd., 1 F.4th 257, 263-64 (4th Cir. 2021).

It is undisputed that Defendant School Board is an educational institution that receives federal funds. (See TAC (Doc. 73) ¶ 112; Defs' Answer (Doc. 76) ¶ 112.) Defendant School Board also does not dispute that what occurred between R.S. and M.C. was sexual harassment that was "so severe, pervasive, and objectively offense that it deprived [R.S.] of equal access to the educational opportunities and benefits provided by their school." Fairfax Cnty., 1 F.4th at 263; (see Defs' Mem. (Doc. 85) at 8-14). Rather, Defendant School Board argues that upon receiving actual notice of the allegation of sexual harassment, "CHCCS employees promptly investigated . . . and implemented

- 27 -

steps that were reasonably calculated to address the behavior based on the facts known to them and under the totality of the circumstances," (Defs' Mem. (Doc. 85) at 10), and that the facts alleged by Plaintiff "fail to demonstrate that CHCCS or its employees acted with deliberate indifference," (id. at 13–14). Plaintiff argues in response that "Defendants acted with deliberate indifference to her sexual harassment by failing to take prompt effective steps reasonably calculated to end the hostile environment." (Pls.' Resp. (Doc. 94) at 15.)

## 1. **Actual Notice**

"Under Title IX, a school's actual notice of the alleged sexual harassment is what triggers its duty to investigate." Fairfax Cnty., 1 F.4th at 268 (citing Davis, 526 U.S. at 649–50) (emphasis added); see also Baynard v. Malone, 268 F.3d 228, 237 (4th Cir. 2001) (explaining that "the Supreme Court has expressly rejected the use of 'principles of respondeat superior or constructive notice' for imposing liability on a school district under Title IX" (quoting Gebser v. Lago Vista Ind. Sch.

Dist., 524 U.S. 274, 285 (1998)).[23] A school has "actual notice" of "misconduct prohibited by Title IX" if "an appropriate official in fact received such a report or complaint and . . . a reasonable official would construe it as alleging misconduct prohibited by Title IX." Id.[24]

Defendants contend that the School Board acquired actual notice on November 1, 2019, when Plaintiff e-mailed R.S.'s report to Defendant Principal Bivins, Selene Paque, Madeline Maldonado, Barbie Garayua-Tudryn, and Karen Galassi-Ferrer. (Defs.' Mem. (Doc. 85) at 10 ("The undisputed facts show that upon receiving actual knowledge of a report [of] alleged sexual harassment on November 1, 2019 . . . .").) Plaintiff does not

_____

[23] Plaintiff argues that Department of Education guidelines impose a "constructive notice" standard, "making schools liable for sexual harassment when a 'responsible employee' knew or should have known of the harassment." (Pls.' Resp. (Doc. 94) at 8.) The current Title IX regulations state that "[a] recipient with knowledge of conduct that reasonably may constitute sex discrimination in its education program or activity must respond promptly and effectively." 34 C.F.R. § 106.44(a)(1). They do not purport to impose a "constructive notice" standard. But even if they did, it is well-settled that the Department of Education's "administrative enforcement standard need not be identical to the standard for monetary damages in private litigation." 89 Fed. Reg. 83 33474, 33499 (2024). This is because a private right of action under Title IX is "judicially implied," and thus courts have "a measure of latitude to shape a sensible remedial scheme that best comports with the statute." Gebser, 524 U.S. at 284.

[24] "An 'appropriate person' under § 1682 is, at a minimum, an official of the recipient entity with authority to take corrective action to end the discrimination." Gebser, 524 U.S. at 290.

argue otherwise and agrees that "Defendant Bivins was a school official who had the authority to address the harassment of R.S. that was disclosed to her . . . placing Defendant Board on [n]otice." (Pls.' Resp. (Doc. 94) at 8.)

### 2.   **Deliberate Indifference**

Given the above analysis, the crux of this Title IX dispute is whether Defendant School Board's response, after acquiring actual notice on November 1, 2019, to the incident between R.S. and M.C. amounted to "deliberate indifference," such that the lack of response either "cause[d] [R.S.] to undergo harassment," or "ma[de] [her] liable or vulnerable to the harassment." See Fairfax Cnty., 1 F.4th at 273–74 (citation and internal quotation marks omitted). Courts may decide the question of deliberate indifference as a matter of law at summary judgment. See Davis, 526 U.S. at 649.

Deliberate indifference is a high bar — "a school will be liable for student-on-student harassment only where its 'response . . . or lack thereof is clearly unreasonable in light of the known circumstances.'" S.B. ex rel. A.L. v. Bd. of Educ. of Harford Cnty., 819 F.3d 69, 76–77 (4th Cir. 2016) (applying Title IX's deliberate indifference standard in Rehabilitation Act context) (quoting Davis, 526 U.S. at 648). "The purpose of the high standard of deliberate indifference is to limit a

school's liability to situations where there is 'an official decision by the [school] not to remedy the violation.'" Gonzales v. Marshall Univ. Bd. of Governors, No. CV 3:18-0235, 2019 WL 3432533, at *4 (S.D.W. Va. July 30, 2019), aff'd, 830 F. App'x 403 (4th Cir. 2020) (quoting Davis, 526 U.S. at 642). Courts, in analyzing the question of deliberate indifference, must be cognizant of the fact that "school administrators are entitled to substantial deference when they calibrate a disciplinary response to student-on-student bullying or harassment." S.B. ex rel. A.L., 819 F.3d at 77.

A school's responses "do not become 'clearly unreasonable' simply because a victim or his parents advocated for stronger remedial measures," id. (citation omitted), nor is a school district considered deliberately indifferent to a report of sexual harassment because its response did not "remedy" the harassment. See Davis, 526 U.S. at 648–49 (explaining that funding recipients are not required to "'remedy' peer harassment" but are only required to "respond to known peer harassment in a manner that is not clearly unreasonable"). However, deliberate indifference may be found where a "school 'dragged its feet' before implementing 'little more than half-hearted measures.'" S.B. ex rel. A.L., 819 F.3d at 77 (quoting

Zeno v. Pine Plains Cent. Sch. Dist., 702 F.3d 655, 669-70 (2d Cir. 2012)).

In its Motion for Summary Judgment, Defendant School Board argues that it did not act with deliberate indifference in response to R.S.'s report because Principal Bivins "immediately began investigating the report made by Plaintiff," "made a report to law enforcement," "held conversations with the involved students," "had conferences with their parents," "arranged for a safe touch lesson to be held with the kindergarten classes," and "designed and instituted a safety plan specifically geared towards R.S." (Defs.' Mem. (Doc. 85) at 10-11.)

Plaintiff argues that Defendant School Board's response was "clearly unreasonable" because 1) M.C. was allowed to remain in Paque's class, 2) Defendant School Board did not require M.C. to be psychologically evaluated, nor require him to receive a "full psychological evaluation or an evaluation of risk for problematic sexual behavior," 3) the school did not reach out to R.S.'s pediatrician or her therapist, 4) M.C. "received no consequences," 5) the school counselor was "dismissive" of R.S.'s trauma and "did not support the recommendation that [M.C.] and R.S. remain separated," 6) did not grant "R.S.'s basic request in scheduling a restorative conference with her

and [M.C.]," 7) denied "Guardian's request to have a restorative conference with the staff," 8) "failed to log the incident into PowerSchool and complete the requisite office discipline referral form and/or Bullying and Harassment Reporting form," and 9) failed to keep M.C. away from R.S., which led to "[M.C.] threaten[ing] R.S. again while they were on the playground during recesses." (Pls.' Resp. (Doc. 94) at 9–14.)

The undisputed evidence shows that the school responded as follows. Within 72 hours of Fox's initial report, Principal Bivins 1) discussed the incident with R.S.'s teacher and the TA, (Pls.' Ex. 16, Investigation Notes (Doc. 94-16) at 2), 2) interviewed R.S. about the incident, praising her for her bravery and telling R.S. that she could go to any of several adults if she was feeling uncomfortable, (R.S. Initial Meeting – Full (Doc. 105) at 17:10–18:19), 3) met with M.C. to discuss the incident and verbally reprimand him,[25] (Pls.' Ex. 34, Bivins Dep. (Doc. 94-34) at 11), 4) interviewed several of R.S. and M.C.'s classmates, (Pls.' Ex. 16, Investigation Notes (Doc. 94-16) at

_____

[25] Plaintiff argues that M.C. received "no consequences." (Pls.' Resp. (Doc. 94) at 11–12.) The record does not support such an argument. While M.C. may not have been suspended or expelled, the record shows that M.C. was verbally reprimanded by the principal of his school and his conduct was reported to his parents. The Fourth Circuit has recognized "student warnings" and "parent phone calls," as forms of student discipline. See S.B. ex rel. A.L., 819 F.3d at 72.

- 33 -

1; Pls.' Ex. 34, Bivins Dep. (Doc. 94-34) at 12–13), 5) interviewed M.C.'s older brother, (Pls.' Ex. 16, Investigation Notes (Doc. 94-16) at 1), 6) met in person with M.C.'s parents to discuss the incident, (Pls.' Ex. 34, Bivins Dep. (Doc. 94-34) at 7–8), and 7) met with the Assistant Principal and the school counselor to devise a plan for R.S.'s safety, (Pls.' Ex. 34, Bivins Dep. (Doc. 94-34) at 15–16).

The evening of November 4, (within 73 hours of the initial report), Bivins emailed Fox advising her of the steps that had been completed during the school day and the steps that would be taken in the coming days, which included 1) meeting with other kindergarten assistants to discuss student supervision and student reporting for situations like this, 2) alerting "Ms. Raquel" that R.S. viewed her as a safety person, 3) instructing Paque to rearrange seating in the classroom so that R.S. and M.C. would not be seated near each other, 4) filing a police report and 5) scheduling a "formal class lesson on safety, tickling and touching." (Pls.' Ex. 30, E-mail chain (Doc. 94-30) at 5.) She also, at this time, offered Fox the option for R.S. to switch classes. (Id.)

The school continued to take steps in response to the incident throughout the remainder of November, as R.S. continued to be absent from school. For example, throughout the week of

- 34 -

November 4, Bivins filed a police report, (Pls.' Ex. 18, R.S. Police Report (Doc. 94-18) at 1), met with TAs on Wednesday, November 6, to discuss the situation, supervision, and student reports, (Pls.' Ex. 30, E-mail chain (Doc. 94-30) at 6), and acceded to Fox's request that R.S. be switched to a specific teacher's classroom, (id.). Also that week, R.S.'s kindergarten class received their "formal class lesson on safety, tickling and touching." (See id. at 8 (November 20 email from Bivins stating: "Safe Touch presentation given to Paque's class and other K-1 classes two weeks ago. . . ."). The following week, with R.S. still absent, more steps were taken — on Tuesday, November 12, Bivins elevated R.S.'s report, referring Fox's emails to the central office of the school district, (id.), and around November 14, the school district's lawyer and two human resources representatives met with Fox to discuss the incident, (Defs.' Ex. 4, Fox. Dep. (Doc. 85-4) at 107).[26] The following week, after continued absence from R.S., the school responded with more steps, offering for either R.S. or the other student to switch classes, increasing the number of adults supervising kindergarten recess, and noting that there would be additional training for teachers and TAs about student supervision,

---

[26] At some point, Williams also offered Plaintiff the option to switch schools. (See Defs.' Ex. 4, Fox Dep. (Doc. 85-4) at 325.)

confirming that M.C.'s family had followed up with the police, DSS, and a therapist, and offering school-based mental health for R.S. (Pls.' Ex. 30, E-mail chain (Doc. 94-30) at 8.)

After R.S.'s disclosure on November 21, 2019, of additional details regarding the initial incident, Bivins responded within minutes, encouraging Fox to report additional details to the police. (Pls.' Ex. 32, "[R.S.] returning" e-mail chain (Doc. 94-32) at 3.) When R.S. returned to school on November 22, the school arranged for M.C. to switch to a different class, (see Pls.' Ex. 9, Fox Decl. (Doc. 94-9) at 15), and held a "reorientation" meeting for R.S., (see Defs.' Ex. 4, Fox Dep. (Doc. 85-4) at 284-86; Pls.' Ex. 9, Fox Decl. (Doc. 94-9) at 9.)[27] When R.S. told her parents that M.C. had threatened her, the evidence shows that the school promptly investigated, found the report unsubstantiated, and confirmed that staff were closely watching the children to prevent interaction. (See Defs.' Ex. 5, "[R.S.] returning" e-mail chain (Doc. 85-5) at 5-6.)

---

[27] Although Plaintiff Fox states in her Declaration that he orientation meeting "was not what we expected or what R.S.'s trauma therapist had designed," (Pls.' Ex. 9, Fox Decl. (Doc. 94-9) at 9), she stated in her deposition she agreed that at her family's request, the staff "made an effort to welcome [R.S.] back," (Defs.' Ex. 4, Fox Dep. (Doc. 85-4) at 287).

Plaintiff, in her briefing, has not cited any cases to support a conclusion that the remedial measures Defendant School Board took constitute "deliberate indifference." (See generally Pls.' Resp. (Doc. 94) at 9-15.) Instead, Plaintiff argues first that Defendant School Board's response was clearly unreasonable because "[a]t no point did Defendant Bivins require that [M.C.] be evaluated to determine what his triggers were and if it was safe to allow him to remain in Paque's classroom or be in a setting where he had exposure to R.S. and other minor students." (Id. at 10-11.) In support of this argument, Plaintiff cites to her rebuttal expert, Kelli Underwood's deposition, in which she states that, "most of the time what [she] see[s] is an elimination of contact until there is more information and more recommendations from internal and external experts and resources." (Pls.' Ex. 39, Dep. of Kelli Underwood, LCSW (Doc. 94-39) at 3.)

Defendant School Board's failure to comply with what Plaintiff argues is a customary procedure or an industry standard is inapposite to the question of deliberate indifference, which requires only that "the recipient must merely respond to known peer harassment in a manner that is not clearly unreasonable." Davis, 526 U.S. at 649. While following customary procedures may yield a paradigmatic response to

- 37 -

student-on-student harassment, "[a] showing that [the school] did not employ the best practices or even that it was negligent is insufficient." Butters v. James Madison Univ., 208 F. Supp. 3d 745, 755 (W.D. Va. 2016). Accordingly, to the extent that the parties' experts dispute the School Board's adherence to industry customs, it is not material.

Further, Plaintiff argues that Defendant did not follow its own disciplinary policies.[28] But "a Title IX defendant's failure to comply with its own policy does not prove deliberate indifference." Nance v. Rowan-Salisbury Bd. of Educ., 1:17-cv-957, 2019 WL 1437212, at *5 (M.D.N.C. 2019) (quoting Facchetti v. Bridgewater Coll., 175 F. Supp. 3d 627, 638 (W.D. Va. 2016)). To the extent that a school does not comply with its own policies, these "procedural shortcomings do not diminish the substantive impact of all the steps [the defendants] took in

---

[28] Plaintiff also describes several other FPG student misconduct incidents and how the school responded. (See Pls.' Resp. (Doc. 94) at 13-14.) According to Plaintiff, "Defendants' deliberate indifference to R.S.'s harassment can also be demonstrated through a review of some of Defendant Bivins' history of consequences given to students at Frank Porter Graham who committed similar Levels of offenses as [M.C.]." (Id. at 13.) But beyond this conclusory statement, Plaintiff does not explain how Defendant School Board's response to other incidents not at issue here could be relevant to whether Defendant School Board responded with deliberate indifference to R.S.'s report, nor does Plaintiff cite any cases where courts have taken this kind of extraneous information into consideration when determining if an educational entity has acted with "deliberate indifference."

response to [a plaintiff's] complaints." <u>Doe v. Bd. of Educ. of</u>
<u>Prince George's Cnty.</u>, 605 F. App'x 159, 168 (4th Cir. 2015)
(citation and internal quotation marks omitted).

As discussed above, the bar for what constitutes deliberate
indifference is high, <u>see</u> <u>Fairfax Cnty.</u>, 1 F.4th at 268; <u>S.B. ex</u>
<u>rel. A.L.</u>, 819 F.3d at 76-77, and the Fourth Circuit's
application of the deliberate indifference standard exemplifies
that principle. For example, in <u>Fairfax County</u> the Fourth
Circuit concluded that a reasonable jury could find the school
had responded to a report of sexual assault with deliberate
indifference. 1 F.4th at 272-73. There, a high school junior was
sexually assaulted on a school band bus trip out of state. When
her friends reported the incident to school officials, the
school officials "took no action regarding these reports during
the trip, and they did not speak to either [the victim] or her
parents about what had happened on the bus ride." <u>Id.</u> at 261.
Further, school officials "made inappropriate jokes about the
reported incident," asked the victim "a number of accusatory
questions," "discussed with [the victim], <u>but not with [the</u>
<u>assailant]</u>, the possibility of being disciplined for engaging in
sexual activity on a school trip," and never "spoke with other
students who were identified as potential sources of information
about the bus incident." <u>Id.</u> at 271-72.

Similarly, in <u>Jennings v. University of North Carolina</u>, the Fourth Circuit held that a reasonable jury could find the school had been deliberately indifferent to a student's complaint of sexual harassment where the student reported that her coach had made consistent sexually charged comments towards her and the school's highest lawyer "dismissed this complaint by telling [the plaintiff] that [the coach] was a 'great guy' and that she should work out her problems directly with him." 482 F.3d 686, 700-01 (4th Cir. 2007). In other words, "the University's failure to take <u>any action</u> to remedy the situation would allow a rational jury to find deliberate indifference to ongoing discrimination." <u>Id.</u> at 701 (emphasis added).

Defendant School Board's layered response to R.S.'s report is distinct from the apathy of the educational institutions in <u>Fairfax County</u> and <u>Jennings</u>. Rather, Defendant School Board's response is factually similar to many cases within this circuit finding that educational institutions were not deliberately indifferent as a matter of law. <u>See</u> <u>S.B. ex rel. A.L.</u>, 819 F.3d at 77 (finding no deliberate indifference where school responded to high schooler's report of bullying and sexual harassment by investigating, disciplining offenders with consequences ranging from "parent phone calls to detentions to suspensions," and assigning a "paraeducator" to accompany victim during the day);

- 40 -

<u>Bd. of Educ. of Prince George's Cnty</u>, 605 F. App'x at 161-63
(affirming district court's finding that school was not
deliberately indifferent where school responded to fourth
grader's report that classmate exposed his genitals to him,
verbally sexually harassed him, and tried to climb into his
bathroom stall by instructing teacher to rearrange the classroom
so the students were not near each other, suspending perpetrator
for five days, and "implement[ing] procedures to protect" the
victim while he used the bathroom); <u>Rouse v. Duke Univ.</u>, 914 F.
Supp. 2d 717, 724-27 (M.D.N.C. 2012), <u>aff'd</u>, 535 Fed. App'x 289
(4th Cir. 2013) (finding no deliberate indifference to student's
report of rape where school cooperated with law enforcement
during investigation and suspended resident of the house where
it occurred).

Factually analogous out-of-circuit caselaw analyzing
schools' responses to reports of young children engaging in
sexual touching also supports a finding that Defendant School
Board was not deliberately indifferent to R.S.'s report. <u>See</u>
<u>Brooks v. City of Philadelphia</u>, 747 F. Supp. 2d 477, 481-84
(E.D. Pa. 2010) (finding school did not act with deliberate
indifference to report of a kindergartener touching his
classmate's genitalia in the bathroom where it responded by
speaking to both boys, contacting parents, requesting they not

be able to use the bathroom at the same time, and changing their seats); Fitzgerald v. Barnstable Sch. Comm., 504 F.3d 165, 169, 173 (1st Cir. 2007) (reversed on other grounds) (finding no deliberate indifference to kindergartener's report that student on bus "bullied her into pulling down her underpants and spreading her legs," where school "immediately launched an investigation . . . [which] consisted of . . . interviews" of the victim, perpetrator, bus driver, and other students on the bus, and "cooperated fully in an investigation undertaken by the local police," "offered to change [the victim's] transit assignment"); Gabrielle M. v. Park Forest-Chi. Heights, IL. Sch. Dist. 163, 315 F.3d 817, 825 (7th Cir. 2003) ("[I]n light of each of the immediate disciplinary and preventive steps the school district had already taken in response to [perpetrator's] conduct, including most prominently the decisions to move him to another class entirely and eventually to grant [victim's] request for a school transfer; it was not clearly unreasonable as a matter of law initially to assign an instructor to oversee a communal recess and lunch period instead of immediately rescheduling the lunch and recess period for a whole kindergarten class.").

Plaintiff may have been displeased with the response by Defendant School District. And the response itself may not have

been perfect. "But Title IX does not require educational institutions to take heroic measures, to perform flawless investigations, to craft perfect solutions, or to adopt strategies advocated by parents. The test is objective — whether the institution's response, evaluated in light of the known circumstances, is so deficient as to be clearly unreasonable." Fitzgerald, 504 F.3d at 174. In the absence of what amounts to "effectively 'an official decision by [the school] not to remedy' student-on-student harassment," a school will not be held liable under Title IX. See S.B. ex rel. A.L., 819 F.3d at 76–77.[29]

_____

[29] It also bears noting that both parties have submitted expert reports. The experts disagree as to the adequacy of the steps taken by Defendant School Board. (Compare Pls.' Ex. 10, Decl. of Pls.' Expert Witness, Jessica Hubbard, MSW, LCSW (Doc. 94-10) at 22 (expressing "concerns that the school's response was not sufficient to protect R.S. from future harm"); Pls.' Ex. 14, Decl. of Pls.' Expert Rebuttal Witness Kelli Underwood, MSW, LCSW (Doc. 94-14) at 16 ("The Chapel-Hill Carrboro City School District and its personnel's procedures and responses were deficient in meeting the standards of care and safety needs of R.S. and other students."), with Defs.' Ex. 3, Aff. of Elizabeth Rodano, Ed.D. (Doc. 85-3) at 3 ("[Defendants] responded in a timely and appropriate manner to the initial parent report of the incident.").) As explained above, determining the adequacy of Defendant School Board's response to R.S.'s report and whether it constituted "deliberate indifference" as established by Title IX caselaw may be answered as a matter of law. See Davis, 526 U.S. at 649. Accordingly, the experts' dispute regarding the adequacy of Defendant School Board's response is not a dispute of material fact, but rather a dispute of law that does not prevent this court from granting summary judgment.

- 43 -

This court finds that no reasonable jury could find that Defendant School Board responded to the incident here with deliberate indifference. Accordingly, this court grants Defendants' Motion for Summary Judgment as to Plaintiff's Title IX claim.

**B.    42 U.S.C. § 1983 Claims**

Plaintiff alleges that Defendants Bivins and Williams violated her Fourteenth Amendment rights to Equal Protection and to personal security and bodily integrity, (see TAC (Doc. 73) ¶ 137), and that Defendant School Board, Defendant Gonzalez, and Defendant Whitted-Miller "operated under unconstitutional policies and/or practices." (Id. ¶ 138.) She pursues relief for these violations via 42 U.S.C. § 1983 against Defendant School Board, and Defendants Williams, Bivins, Gonzalez, and Whitted-Miller in their individual capacities. (Id. ¶¶ 131–161.)

42 U.S.C. § 1983 provides that

> [e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983. "Under 42 U.S.C. § 1983, a plaintiff must establish three elements to state a cause of action: (1) the

- 44 -

deprivation of a right secured by the Constitution or a federal
statute; (2) by a person; (3) acting under color of state law."
Jenkins v. Medford, 119 F.3d 1156, 1159-60 (4th Cir. 1997).

As an initial matter, Defendants argue that Plaintiff has
not put forth sufficient evidence to maintain § 1983 claims
against Defendants Whitted-Miller and Gonzalez. (Defs.' Mem.
(Doc. 85) at 17-19.) Plaintiff does not respond to this argument
and in fact, makes no mention of Whitted-Miller or Gonzalez in
the section of her response dedicated to her § 1983 claims. (See
Pls.' Resp. (Doc. 94) at 15-18.) This court thus finds that
Plaintiff has abandoned her § 1983 claims against Defendants
Whitted-Miller and Gonzalez in their individual capacities. See
supra n.22. In her response, Plaintiff clarifies her § 1983
claims as follows. She argues 1) Defendant Bivins' various
actions and inactions violated R.S.'s constitutional rights, 2)
Defendant Williams, as her supervisor, "use[d] her role as a
direct facilitation of Bivins' discrimination," and 3) Defendant
School Board, "has a custom and practice in allowing staff . . .
to conduct Title IX training investigations without training."
(Pls.' Resp. (Doc. 94) at 15-16.) Accordingly, this court
understands Plaintiff to argue that Defendant Bivins violated
R.S.'s constitutional rights, and that liability should
additionally be imputed to both Williams, as her supervisor, see

- 45 -

<u>Shaw v. Stroud</u>, 13 F.3d 791, 798–99 (4th Cir. 1994) (recognizing § 1983 supervisory liability), and the School Board as the municipality that employs her, see <u>Monell v. Dep't of Soc. Servs. of the City of New York</u>, 436 U.S. 658, 690 (1978) (recognizing § 1983 municipal liability).

> 1. **<u>Deprivation of a right secured by the Constitution or a federal statute</u>**

Accordingly, this court must determine whether a reasonable jury could find that Defendant Bivins deprived R.S. of her 1) right to equal protection and 2) her right to bodily integrity and personal security.

> i. **<u>Equal Protection Clause</u>**

In her TAC, Plaintiff invokes the Equal Protection Clause of the Fourteenth Amendment, which states that "[n]o state shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. Plaintiff alleges that "Defendants discriminated against R.S. based on her sex and gender by not providing her with the equal protections of the law and defendants [sic] policies and procedures." (TAC (Doc. 73) at 19.) In the context of a school's response to student-on-student harassment, a plaintiff may show the Equal Protection Clause was violated where a school administrator, "motived by a discriminatory intent," "responded to the

- 46 -

discriminatory peer harassment with deliberate indifference."
Feminist Majority Found. v. Hurley, 911 F.3d 674, 702-03 (4th
Cir. 2018). Alternatively, a plaintiff may allege that the Equal
Protection Clause was violated based on "discriminatory
treatment in the investigation of student behavior and in the
treatment of student complaints." Fitzgerald v. Barnstable Sch.
Comm., 555 U.S. 246, 260 (2009).

### Deliberate Indifference Theory

Defendants argue that "there is no evidence to support a
claim that Individual Defendants acted with deliberate
indifference." (Defs.' Mem. (Doc. 85) at 17.) Plaintiff's
response does not directly refute this argument,[30] focusing her
response on pointing out facts that she argues demonstrate
Defendant Bivins' and Defendant Williams' discriminatory
intent.[31]

---

[30] Within the section of Plaintiff's response entitled
"Count 2: 14th Amendment, 42 U.S.C. § 1983," there is not a
single case cited — a briefing infirmity which makes it
difficult for this court to ascertain Plaintiff's legal
arguments and violates Local Civil Rule 56.1(e), which states:
"In a responsive brief the party having made the challenged
claim may, within 30 days after service of the summary judgment
motion and brief, file with the Court a response that . . . sets
out the elements that it must prove (with citations to
supporting authority)." L.R. 56.1(e) (emphasis added).
[31] (See Pls.' Resp. (Doc. 94) at 16 (titling argument
"Defendant Bivins and Defendant Williams deliberate indiffernce
[sic] to R.S.'s harassment was movitated [sic] by their bias
agaisnt [sic] student on student sexual assault complainants").)

For the same reasons discussed extensively above, supra Section IV.A.2, this court finds that Defendant Bivins response to R.S.'s report was not "deliberately indifferent." See Hurley, 911 F.3d at 703 (recognizing similarity between Title IX and equal protection "deliberate indifference" standards and referring to Title IX analysis in discussing equal protection claim). Because deliberate indifference is a necessary element of this equal protection theory, this court need not reach the merits of the other elements.

### Discriminatory Investigation Theory

Plaintiff's equal protection theory based on "discriminatory treatment in the investigation" must also fail. See Fitzgerald, 555 U.S. at 260. An equal protection claim based on discriminatory treatment requires a plaintiff to first show that "[s]he has been treated differently from others with whom [s]he is similarly situated and that the unequal treatment was the result of intentional or purposeful discrimination." Morrison v. Garraghty, 239 F.3d 648, 654 (4th Cir. 2001).

To the extent Plaintiff argues that Bivins' investigative steps were discriminatory based upon her sex, Plaintiff has not put forth evidence that she was treated differently from male students with whom she is similarly situated. The only person she argues she was treated differently than is minor K.G. (Pls.'

Resp. (Doc. 94) at 15.) Specifically, Plaintiff contends that Bivins concluded that minor K.G.'s report that M.C. touched him was "substantiated" while hers was not, despite the fact that no "students reported to [Bivins] that they saw [M.C.] touch K.G.'S [sic] privates either." (Id.) Regardless of Bivins' subjective belief as to the veracity of the reports, there is no evidence that K.G. received more favorable treatment than R.S. See English v. Clarke, 90 F.4th 636, 649 (4th Cir. 2024) (granting summary judgment as to equal protection claim because plaintiff "has not attempted to identify any better-treated individuals similarly situated to him, nor has he brought to the court any evidence suggesting such individuals might exist"). Both R.S. and K.G. were listed as victims on the official police report filed by Bivins and R.S. received a variety of school-sponsored responses for her safety — there is no evidence that K.G. received even the same, let alone better, treatment.

To the extent Plaintiff argues that school officials discriminated against her as a "sexual assault complainant," this too must fail. Plaintiff identifies several reported non-sexual assault incidents, (see Pls.' Resp. (Doc. 94) at 16), and argues that the perpetrators in those incidents received more severe treatment than M.C. In focusing on the differential treatment of the offenders, she fails to identify any difference

- 49 -

in treatment of the <u>reporters</u> of the conduct. As explained
above, equal protection claims require the plaintiff to show
that <u>they</u> were treated differently than similarly situated
individuals. Plaintiff has failed to do so.

Even if this court were to construe Plaintiff's argument to
be that school officials took reports of non-sexual assault more
seriously than reports of sexual assault, the evidence does not
show that R.S. and any of the referenced victims are "similarly
situated," such that they are "in all relevant respects alike."
<u>Nordlinger v. Hahn</u>, 505 U.S. 1, 10 (1992). The three victims
referenced by Plaintiff were threatened or assaulted by nine and
ten year olds. R.S., instead, was assaulted by a five-year-old.
<u>See</u> <u>United States v. Johnson</u>, 122 F. Supp. 3d 272, 361 (M.D.N.C.
2015) ("[I]n determining whether persons are similarly situated
for equal protection purposes, a court must examine all relevant
factors.").

And even if this court were to assume that these
individuals are "similarly situated" to R.S., Plaintiff has not
cited any caselaw to support a finding that "sexual-assault
complainants" are a protected class under the equal protection
clause. Accordingly, any disparate treatment between the
"sexual-assault complainant" group and the "non-sexual assault
complainant" group will be "presumed to be valid and will be

- 50 -

sustained 'if there is a rational relationship between the disparity of treatment and some legitimate governmental purpose.'" <u>King v. Rubenstein</u>, 825 F.3d 206, 221 (4th Cir. 2016) (citation omitted). "The showing required to overturn that presumption is steep. A challenger must show there is no 'rational relationship between the disparity of treatment and some legitimate governmental purpose.'" <u>Doe v. Settle</u>, 24 F.4th 932, 943 (4th Cir. 2022). Plaintiff has not put forth any argument nor evidence that this purported differential treatment fails to satisfy rational basis review.

### ii. <u>Substantive Due Process Claim</u>

Plaintiff also alleges in the TAC that "Defendant Emily Bivins and Misti Williams subjected R.S. to violations of her rights to . . . personal security and bodily integrity." (TAC (Doc. 73) ¶ 137.) In this case, R.S. does not allege that Bivins or Williams directly violated her rights to personal security and bodily integrity. Rather, she proceeds on the theory that state actors failed to protect her from the acts of M.C., a private citizen.[32]

This claim invokes the Fourteenth Amendment's substantive due process clause, which protects against state intrusions

---

[32] Again, as discussed <u>supra</u> n.30, Plaintiff, in her response to summary judgment, does not cite any caselaw in support of this claim.

- 51 -

against bodily integrity without due process of law. See Ingraham v. Wright, 430 U.S. 651, 673–74 (1977); Doe v. Rosa, 795 F.3d 429, 436–37 (4th Cir. 2015). However, "nothing in the language of the Due Process Clause itself requires the State to protect the life, liberty, and property of its citizens against invasion by private actors." DeShaney v. Winnebago Cnty. Dep't of Soc. Servs., 489 U.S. 189, 195 (1989). The general rule is that "a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause." Id. at 197. There are two exceptions to this general rule. First, "if the state has a special relationship with an individual, the state has an affirmative duty to protect the individual from harm inflicted by third parties." Stevenson ex rel. Stevenson v. Martin Cnty. Bd. of Edu., 3 F. App'x 25, 30 (4th Cir. 2001). Second, a state can be liable "when the state itself creates the danger." Id. at 31.

The "special relationship" exception does not apply here. The Supreme Court has identified "certain limited circumstances," where "the Constitution imposes upon the State affirmative duties of care and protection with respect to particular individuals," such as "incarcerated prisoners" and "involuntarily committed mental patients." DeShaney, 489 U.S. at 198–99. These special relationships recognize that "when the

State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being." Id. at 200-01.

Courts across the country have declined to extend this affirmative "special relationship" duty to the school setting. See Stevenson, 3 F. App'x at 30-31 (holding that "no special relationship exists because the student is not in physical custody and, along with parental help, is able to care for his basic human needs"); Doe v. Hillsboro Ind. Sch. Dist., 113 F.3d 1412, 1415 (5th Cir. 1997) (declining to hold "that compulsory attendance laws alone create a special relationship giving rise to a constitutionally rooted duty of school officials to protect students from private actors"); Doe v. Claiborne Cnty., Tenn. By & Through Claiborne Cnty. Bd. of Educ., 103 F.3d 495, 510 (6th Cir. 1996) (same); Dorothy J. v. Little Rock Sch. Dist., 7 F.3d 729, 733 (8th Cir. 1993) (same); D.R. by L.R. v. Middle Bucks Area Vocational Tech. Sch., 972 F.2d 1364, 1372 (3d Cir. 1992); J.O. v. Alton Cmty. Unit Sch. Dist. 11, 909 F.2d 267, 272 (7th Cir. 1990); Maldonado v. Josey, 975 F.2d 727, 732-33 (10th Cir. 1992). This court agrees with the reasoning of the Fourth Circuit's unpublished opinion and the numerous circuit courts that hold similarly.

As to the "state-created danger" exception, "to establish §
1983 liability based on [this] theory, a plaintiff must show
that the state actor created or increased the risk of private
danger, and did so directly through affirmative acts, not merely
through inaction or omission." Rosa, 795 F.3d at 439. "As
DeShaney makes clear, allowing continued exposure to an existing
danger by failing to intervene is not the equivalent of creating
or increasing the risk of that danger." Id. at 439.

Plaintiff has not cited any facts to support an argument
that any state actors created or increased R.S.'s risk of
private danger at school. Instead Plaintiff argues that
"Defendants continues [sic] to fail to institute corrective
measures to prevent gaps in supervision." (Pls.' Resp. (Doc. 94)
at 18.) Accordingly, Plaintiff's substantive due process claim
is "purely an omission claim, and no amount of semantics can
disguise the fact that the real affirmative act here was
committed" not by any state actors, but by M.C. See Rosa, 795
F.3d at 441 (cleaned up). In fact, as has been discussed at
length, school officials took many steps to decrease her risk,
including but not limited to, verbally reprimanding M.C.,
placing M.C. in another class, having a "safe-touch"
conversation with the kindergarteners, emphasizing the need for
supervision on the playground, and assigning specific staff

- 54 -

members to watch both R.S. and M.C. Ultimately, "[f]ailing to provide protection from danger does not implicate the state in the harm caused by third parties." <u>Stevenson</u>, 3 F. App'x at 31.

Because Plaintiff has not put forth evidence that Defendant Bivins violated either her right to equal protection or her right to bodily integrity and personal security, the claim against Bivins in her individual capacity must fail as a matter of law. Accordingly, in the absence of a constitutional violation by a state actor, neither supervisory liability against Williams nor supervisory liability against Defendant School Board may lie. <u>See</u> <u>Temkin v. Frederick Cnty. Comm'rs</u>, 945 F.2d 716, 724 (4th Cir. 1991) (finding no supervisory liability "absent a finding of a constitutional violation on the part of the person being supervised"); <u>Grayson v. Peed</u>, 195 F.3d 692, 697 (4th Cir. 1999) (explaining that where "there are no underlying constitutional violations by any individual, there can be no municipal liability") (abrogated on other grounds). As a result, this court grants Defendants' Motion for Summary Judgment as to Plaintiff's § 1983 claims.

## C.    <u>State Law Claims</u>

Plaintiff R.S. also brings a state law claim of negligent infliction of emotional distress against Defendant Board and Defendant Bivins in her individual capacity, (TAC (Doc. 73) ¶¶

- 55 -

162-179), and a state law claim of negligent supervision and retention against Defendant Board, (id. ¶¶ 180-192). Plaintiff Fox brings a state law claim of parental loss of services and companionship against Defendant Board. (Id. ¶¶ 193-195.)

These claims are before this court pursuant to supplemental jurisdiction, as they arose from the same "case or controversy" as Plaintiff's § 1983 claims, see 28 U.S.C. § 1367(a), and are based on a common set of facts, see United Mine Workers of Am. v. Gibbs, 383 U.S. 715, 725 (1966) (requiring state and federal claims to "derive from a common nucleus of operative fact").

"The district courts may decline to exercise supplemental jurisdiction over a claim" if "the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c). This court has granted summary judgment as to all federal claims and, after considering factors such as judicial economy, convenience, fairness, and comity, it declines to exercise supplemental jurisdiction. See Henderson v. Harmon, 102 F.4th 242, 251 (4th Cir. 2024) ("[G]enerally, when a district court dismisses all federal claims in the early stages of litigation — e.g., at the summary-judgment stage — it should decline to exercise jurisdiction over any remaining pendent state law claims by dismissing those claims without prejudice."

(citations and internal quotation marks omitted)). Accordingly, Plaintiff's state law claims are dismissed without prejudice.

## V. <u>PLAINTIFF'S MOTION TO REDACT AND SUBSTITUTE FILED DOCUMENTS</u>

On March 10, 2025, Plaintiffs moved this court to allow "the redaction of certain information contained in the Court's docket" and "the removal of certain pages that were accidentally filed with the Court which contain sensitive information and for those same documents to be replaced with identical pages that have been redacted." (Doc. 138 at 1.) Specifically, Plaintiffs state that the affidavits certifying service of deposition notices found at Docket Entries 37 and 38, as well as the titles of those Docket Entries, contain the names of the parents of a non-party minor. (<u>Id.</u> at 1–2.) Plaintiffs contend that the disclosure of non-party parents' names could lead to the discovery of the identity of the non-party minor. (<u>Id.</u> at 2.) Plaintiffs seek to redact the non-party parents' names, their address, and replace their names in the docket entry titles with their initials. (<u>Id.</u>) Defendants do not object.

Determining which standard governs the sealing of a document depends on the characterization of the document itself. Judicial records, which are documents that "play a role in the adjudicative process, or adjudicate substantive rights," <u>see</u> <u>In re</u> <u>U.S. for an Ord. Pursuant to 18 U.S.C. Section 2703(D)</u>, 707 F.3d

- 57 -

283, 290-91 (4th Cir. 2013), are governed by either the common law right of access or the First Amendment right of access. See Stone v. Univ. of Maryland Med. Sys. Corp., 855 F.2d 178, 180 (4th Cir. 1988) (explaining that "common law presumption in favor of access attaches to all judicial records," while "First Amendment guarantee of access has been extended only to particular judicial records" (citations and internal quotation marks omitted)). But where "the court does not rely on a document to reach its decision; the document is not a judicial record and no right of access applies." United States ex rel. Thomas v. Duke Univ., No. 1:17-cv-276, 2018 WL 4211375, at *3 (M.D.N.C. Sept. 4, 2018). This court does not rely on the affidavits of service at issue here to reach any decisions, thus neither the common law nor First Amendment rights of access apply.

Federal Rule of Civil Procedure 5.2(e)(1) permits a court to order the redaction of information for "good cause." Fed. R. Civ. P. 5.2(e)(1). Plaintiffs' claims involve sensitive information regarding minors. The continued availability of the names of those minors' parents may allow the public to discover the names of the minors. As such, this court finds that good cause exists to grant Plaintiffs' motion and permit the substitution of the proposed redacted documents.

## VI.  CONCLUSION

Defendant's Motion to Dismiss is denied, because it does not comply with Local Civil Rule 7.3(a).

Defendant's Motion for Summary judgment is granted as to Plaintiff R.S.'s Title IX claim against Defendant School Board because no reasonable jury could find that Defendant School Board responded to Plaintiff's report of sexual assault with deliberate indifference.

Summary judgment is also granted as to Plaintiff R.S.'s § 1983 claims against Defendants Gonzalez and Whitted-Miller in their individual capacities, because, having not addressed their liability in her response, she has abandoned her claims against them. Summary judgment is also granted as to Plaintiff's § 1983 claim against Defendant Bivins in her individual capacity, because no reasonable jury could find that Defendant Bivins violated Plaintiff R.S.'s right to equal protection nor her right to substantive due process. Because Plaintiff fails to put forth evidence of a constitutional violation by Defendant Bivins, her supervisory liability § 1983 claims against Williams and Defendant School Board also fail.

As this court has granted summary judgment as to Plaintiff's two federal law claims, it declines to exercise supplemental jurisdiction over Plaintiff R.S.'s and Plaintiff

Fox's state law claims, and those claims are dismissed without prejudice.

For the foregoing reasons, **IT IS THEREFORE ORDERED** that Defendant's Motion to Dismiss and Answer to Plaintiff's Third Amended Complaint, (Doc. 76), is **DENIED.**

**IT IS FURTHER ORDERED** that Defendants' Motion for Summary Judgment, (Doc. 82), is **GRANTED** and Plaintiffs' Title IX claim and § 1983 claims are **DISMISSED.** The remaining state law claims are **DISMISSED WITHOUT PREJUDICE.**

**IT IS FURTHER ORDERED** that Plaintiffs' Motion in Limine, (Doc. 114), Defendants' Motion in Limine to Bifurcate, (Doc. 117), and Defendants' Motion in Limine to Exclude Certain Evidence, (Doc. 120), are **DENIED AS MOOT.**

**IT IS FURTHER ORDERED** that Plaintiffs' Motion to Redact Information and Substitute Filed Documents, (Doc. 138) is **GRANTED.** The Clerk's Office is instructed to substitute Docket Entries 37 and 38 with the proposed redacted versions attached to Plaintiffs' motion (Docs. 138-1, 138-2, 138-3, 138-4). The Clerk's Office is additionally instructed to edit Docket Entry 37's title by substituting subpoena target's name with "C.R." and to edit Docket Entry 38's title by substituting subpoena target's name with "R.R."

This court will enter a judgment contemporaneously herewith. However, this court retains jurisdiction to resolve Defendant's Motion to Show Cause and for Sanctions, (Doc. 127). The parties are directed to confer and Defendants shall file a notice within 30 days advising whether a further order is necessary as whether the motion is now moot.

This the 31st day of March, 2025.

_____
United States District Judge